UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Christopher S., | ) | |
| | ) | |
| Plaintiff, | ) | No. 22-cv-0684 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Keri L. Holleb Hotaling |
| KILILO KIJAKAZI, Acting Commissioner of the Social Security Administration, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christopher S.[1] appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying him disability benefits. For the reasons set forth below, Plaintiff's motion for summary judgment[2] [Dkt. 18] is GRANTED; Defendant's motion for summary judgment [Dkt. 19] is DENIED. The Commissioner's decision is reversed, and this matter is remanded for further proceedings consistent with this Memorandum Opinion and Order.

I.   BACKGROUND

   A.   Procedural History

Plaintiff applied for Social Security Insurance ("SSI") on April 20, 2020, alleging a disability beginning in March 2015, through his date last insured ("DLI") of June 30, 2019. [Administrative Record ("R.") 154-55, 167-76.] Plaintiff's application was denied initially and upon reconsideration. [R. 68-71, 67.] Plaintiff then requested an administrative hearing. [R. 41-85.] Following that hearing, Administrative Law Judge ("ALJ") Lovert F. Bassett issued a June 4, 2021 decision that Plaintiff was not disabled. [R. 13-27.] On December 6, 2021, the Appeals

---

[1]   In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by his first name and the first initial of his last name(s).

[2]   The Court construes Plaintiff's Brief in Support of Reversing and Remanding the Commissioner's Decision [Dkt. 18] as a motion for summary judgment.

Council denied Plaintiff's request for review [R. 1-4], rendering the ALJ's decision the final decision of the Commissioner, reviewable by the district court under 42 U.S.C. § 405(g). *See* 20 C.F.R. § 404.981; *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2004). Plaintiff then filed this lawsuit seeking review of the ALJ's decision [Dkt. 1]; the case was reassigned to this Court on August 10, 2023.

### B. Relevant Evidence

Plaintiff sought disability benefits beginning on March 15, 2015, for limitations stemming from rheumatoid arthritis, gout, Raynaud's disease,[3] atrial fibrillation, depression, and sleep apnea, and continuing through his June 30, 2019 DLI. [R. 167, 175.] He submitted evidence pre- and post-dating his DLI.

#### 1. Medical Records

Plaintiff has a medical history of chronic pain. In 2015, he had knee surgery, through which he was diagnosed with gout. [R. 455, 436.] After several gout flares in multiple joints, the gout was generally controlled through medication [R. 436, 431, 427, 422, 418, 414, 410-11, 407-08, 403-04, 401, 397-98, 392-93, 387, 383, 379, 375, 369-70, 283], but Plaintiff continued to have pain in both knees and other joints. [R. 283.] He was variously diagnosed with and treated for obesity, osteoarthritis, rheumatoid arthritis, and Raynaud's disease. [*See* R. 283-85 (noting that "once uric acid levels came to goal, [Plaintiff] was still having diffuse joint pain which began to involve other joints including the shoulders, the toes, his back as well as profound fatigue" and "has also developed Raynaud's in the last year and a half and severe nail changes including onycholysis and spooning of the nails in this time frame"); R. 270 (noting that Plaintiff "had a two-

---

[3] "Raynaud's disease is vascular disorder that affects the hands and feet primarily, and causes discoloration of the skin, which is sometimes accompanied by a pricking or tingling sensation and, less commonly, pain. These symptoms are brought on by cold or emotional stimuli and relieved by heat." *Casey v. Kwik Trip, Inc.*, 114 F. App'x 215, 216 (7th Cir. 2004) (citing *Dorland's Illustrated Med. Dictionary* 920, 1324, 1371, 1534 (29th ed. 2000)).

2

and-a-half year history of rather diffuse joint pain" with "[s]ymptoms [] mainly present in the shoulders, knees and hands, . . . flares of full body stiffness" and "has been diagnosed with an undifferentiated connective tissue disease"[4] and "has had positive ANA and RNP findings" after a "10-to-15-year history of gout, which is controlled").] He began regularly seeing a rheumatologist, Dr. David Dansdill, M.D., in 2015 but had outside consultations as fatigue and pain persisted. [R. 506-07, 431, 343-44, 301-02, 283-85.] He was also diagnosed with "moderate to severe obstructive sleep apnea" with sleep fragmentation, which seems to have improved with a new CPAP machine after one was prescribed following a sleep study in 2018 [R. 298-99, 303, 371], obesity that has persisted [*see* R. 360, 366, 372, 376, 384, 398, 414, 419, 422, 426, 431], and atrial fibrillation, which at the relevant time appeared to be reasonably controlled through medication. [R. 278, 282, 292, 306, 372, 376, 542.] Plaintiff also reported a depression diagnosis. [R. 509-16.] His medical records indicate that he was prescribed Ritalin and Adderall for Attention Deficit Disorder by February 17, 2018. [R. 274.]

At his approximately quarterly appointments with Dr. Dansdill and visits with other providers in the same practice Plaintiff received Kenalog injections and recounted pain levels, which, more often than not, were a five or above out of ten. [R. 370, 375, 379, 383, 387, 392, 403, 407, 410, 414, 422.] Plaintiff often reported waves of widespread joint or muscle aches and pain in his knees, shoulders, hands, and wrists. [*See, e.g.*, R. 270, 383, 401, 403, 407, 410.] The treaters adjusted his medications and injections with some regularity after Plaintiff received "moderate[]" or little long-term relief in most instances[5]; they added prednisone or "prednisone burst[s]," prescribed Tramadol to replace Tylenol, "start[ed] methotrexate," then switched Plaintiff to the

---

[4] Neither the parties nor the ALJ explained this diagnosis.

[5] Plaintiff did occasionally report greater, albeit temporary, relief. [R. 410, 414.]

3

"Humira Pen" just before Plaintiff's DLI. [*See, e.g.*, R. 373, 376, 384, 385, 390, 395, 401, 405, 407, 411, 415-16, 419.]

On October 1, 2020, more than a year after his DLI, another rheumatologist diagnosed Plaintiff with fibromyalgia, which he described as "[p]robable diffuse pain syndrome with manifestations of pain all over, stiffness, fatigue, memory difficulty, and insomnia." [R. 676-77, 732-33, 735-36.]

### 2. Treating Physician

In addition to the treatment notes referenced above, on April 23, 2021, Dr. Dansdill, Plaintiff's treating rheumatologist of nearly six years, opined that Plaintiff's pain, swollen joints, morning stiffness, and "daily severe fatigue" stemming from "seronegative rheumatoid arthritis" and other conditions were severe enough to frequently interfere with the attention and concentration needed to perform even simple work tasks, and Plaintiff likely would miss more than four days a month of work due to impairments or treatment and would need unscheduled breaks during an eight-hour workday. [R. 506-07.] He noted that Plaintiff had joint deformities in his knees, reduced bilateral grip strength, tenderness, crepitus in the knees, and 18 of 18 trigger points. [*Id*. at 506.] He opined that Plaintiff had been unable to work full-time beginning in 2018. [*Id*. at 507.]

### 3. Consultative Experts

State agency consultative expert Ranga Reddy, M.D. opined that there was insufficient medical evidence to fully assess Plaintiff's physical limitations prior to his DLI, and the finding was affirmed by Dr. Charles Kenney. [R. 53-57, 63, 65-66.] State consultative psychologist Dr. David Voss opined that no mental medically determinable impairment was established prior to the DLI; Lionel Hudspeth, Psy.D., affirmed that opinion. [R. 56, 63-65.]

4

4. **Plaintiff's Evidence**

In his function report, Plaintiff indicated that his rheumatoid arthritis affects most of his joints, with "flare ups" that "last months at a time and make it difficult/painful to carry on a normal activity" and that "[f]atigue and shortness of breath are a huge issue," with the "need to sleep" being "overpowering at times." [R. 180.] "It [wa]s difficult" for him "to describe an average day" because his "activities are dictated by pain levels, level of fatigue, etc." [R. at 181.] Most days, he is able to drive his daughter to practice and school and cook meals (with breaks during preparation), and he performs twice-weekly shopping for groceries or medication and weekly tasks of mowing the yard on a riding mower, taking out the trash, and cleaning countertops. [R. at 181-83.] He occasionally feeds and lets out the family dog. [R. at 181.] He can pay bills, handle a savings account, count change, and use a checkbook and money orders. [R. at 183.] His personal care takes "much longer" than it had in the past, and pain awakens him when he rolls over in his sleep. [R. 181.] His conditions affect lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentration, and using his hands, although he does not require mobility devices other than a brace or splint (presumably on his knee). [R. at 185, 186.] His "range of motion can be extremely limited" with "excruciating[] pain[]" following "[e]ven the slightest movements." [R. at 185.] He can pay attention for fifteen minutes. [*Id*.]

Plaintiff's wife reported that Plaintiff experienced "extreme fatigue, pain and weakness." Plaintiff "sleeps all the time," although the sleep does not appear restful. She had to remind Plaintiff to shower. According to his wife, Plaintiff is able to cook, ride the lawn mower, drop their child off at practices a few times a month; Plaintiff occasionally grocery shopped; and he was unable to bend to get clothes from the dryer, load or unload the dishwasher, or stay on his feet very long. [R. 200-07.]

5

C. **Social Security Regulations and Standard of Review**

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. Pursuant to the Social Security Act, a person is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1). ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled. The ALJ must start by determining whether: (1) the claimant is currently engaged in substantial gainful activity; (2) the claimant has a severe impairment; and (3) the severe impairment meets or equals one considered conclusively disabling such that the claimant is impeded from performing basic work-related activities. 20 C.F.R. §§ 404.1520, 416.920(a)(4)(i)-(v). If the impairment(s) does meet or equal this standard, the inquiry is over; the claimant is disabled. 20 C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ determines whether (4) the claimant is capable of performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). If he is not capable of performing his past relevant work, the ALJ must consider (5) the claimant's age, education, and prior work experience and evaluate whether he is able to engage in another type of work existing in a significant number of jobs in the national economy. *Id*. At the fourth and fifth steps of the inquiry, the ALJ is required to assess the claimant's residual functional capacity ("RFC") in calculating which work-related activities he is capable of performing given his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to the Commissioner to show there are significant jobs available that the claimant is able to perform. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

Judicial review of the ALJ's decision is confined to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Steele v. Barnhart*, 290

6

F.3d 936, 940 (7th Cir. 2002); *see also* 42 U.S.C. § 405(g). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means . . . 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938) (further citation omitted)); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021)). While this means that the Court does not try the case de novo or supplant the ALJ's findings with the Court's assessment of the evidence, *Young*, 362 F.3d at 1001; *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000), the Court must "review the entire record," *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020), and remand "if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Steele*, 290 F.3d at 940. The ALJ "need not specifically address every piece of evidence but must provide a logical bridge between the evidence and his conclusions." *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023).

**D.    The ALJ's Decision**

The ALJ gave an overview of Plaintiff's conditions and medical history for the period of his alleged onset date of March 15, 2015 through his DLI of June 30, 2019. Although the Administrative Record contained treatment records post-dating Plaintiff's DLI, the ALJ did not engage with or discuss those post-DLI treatment records, which included Plaintiff's fibromyalgia diagnosis. [*See* R. 22 ("Exhibits 9F-13F are all dated post date last insured of June 30, 2019.").][6]

As to Plaintiff's depression, the ALJ found no limitations as to any of the four paragraph B criteria relevant to assessing mental functioning and concluded that any mental impairment was

---

[6]    Given the brevity of the ALJ's statement regarding these post-DLI medical records, the basis for the ALJ's apparent wholesale disregard of them is unclear. Post-DLI evidence, after all, may "shed light on [the claimant's] impairments and disabilities from the relevant insured period." *Rita Mary K. v. Kijakazi*, No. 21 C 4598, 2022 WL 17583780, at *5 (N.D. Ill. Dec. 12, 2022) (cleaned up); *see also Leskowyak v. Kijakazi*, No. 22-1777, 2023 WL 355103, at *2 (7th Cir. Jan. 23, 2023) ("Evidence generated after the claimant's date last insured may be relevant, . . . to the extent it reflects her condition and ability to work before her date last insured.").

non[-]severe. [R. 16-17.] Therefore, the ALJ did not account for any limitations within the RFC he drafted. [R. 16-17.]

The ALJ then determined that Plaintiff had the severe impairments of "obesity; gout; heart failure; rheumatoid arthritis; bilateral knee osteoarthritis; obstructive sleep apnea on CPAP and atrial fibrillation (20 CFR 404.1520(c))." [R. 15.] The ALJ rejected Plaintiff's subjective reports of the severity of his symptoms because the ALJ found them "[un]corroborate[d]" by the "medical records, such as treatment notes." [R. 23.] The ALJ deemed Dr. Dansdill's post-DLI April 23, 2021 assessment of Plaintiff's status unpersuasive as "inconsistent with treatment notes from multiple sources, documenting that during the relevant period, [Plaintiff] has responded well to prescribed treatment," as shown through "treatment notes [that] do not document flares or exacerbations of his pain or any other symptoms, more recent notes [that] document intact clinical findings on physical examination, and psychiatric notes [that] reveal no significant issues with fatigue, concentration, attention or energy level." [R. 25.] The ALJ also found Dr. Dansdill's opinion to be "at odds with the activities noted in the claimant's function report." [*Id.*] The ALJ further found Plaintiff's wife's "statements only somewhat persuasive" due to her lack of medical training, close relationship with Plaintiff, and unidentified "internal[] inconsisten[cies]" with Plaintiff's statements and psychiatric notes. [R. 26.]

The ALJ concluded that, "[a]ll told, . . . on balance, [Plaintiff] has experienced generally good response to prescribed treatment (i.e., injections and medications), as evidenced by no documentation of frequent exacerbations of his pain or heart symptoms, which would require more aggressive form of treatment, such as repeated ER visits or inpatient care; intact clinical findings reported during more recent office visits . . . ; fatigue improved with CPAP []; [and] activities described by the claimant . . . [.]" [R. 24.] Purporting to "credit[] [Plaintiff's] statements to the

8

greatest extent possible, [he] reduced [Plaintiff's] [RFC] to light work[7] and no further restrictions" due to "support[] by the evidence as a whole." [*Id*.] Thus, he found that Plaintiff was not disabled. [R. 27.]

## II. ANALYSIS

Plaintiff argues that the ALJ erred in three ways, although the Court need only address one: the ALJ's determination that Plaintiff's subjective symptom reports were not corroborated by the evidence. In evaluating a claimant's subjective symptom statements, an ALJ must consider factors including: the objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; precipitating or aggravating factors; type, dosage, effectiveness, and side effects of medication; treatment and other measures besides medication taken to relieve pain or other symptoms; and functional limitations due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8 (Oct. 25, 2017). Plaintiff maintains, and the Court agrees, that, in concluding that Plaintiff's description of his symptoms was not supported by the record, the ALJ impermissibly "cherry-picked" supporting facts that are by no means representative of the record. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (explaining that ALJ "cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding); *see also Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014) ("The ALJ simply cannot recite only the evidence that is supportive of her ultimate conclusion without acknowledging and addressing the significant contrary evidence in the record.").

The ALJ's terse rejection of Plaintiff's description of his symptoms as inconsistent with treatment records that he found to "overall" indicate a lack of pain exacerbation or "flares" is

---

[7] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds"; it "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567.

9

perplexing. As for Plaintiff's descriptions of pain, for the relevant period between March 2015, and June 27, 2019 (all prior to Plaintiff's DLI), the ALJ specifically emphasized three instances on which Plaintiff had rated his pain at a three or below out of ten. [R. 20-22 (citing R. 422 (pain two to three out of ten on July 14, 2015); R. 379 (pain at a three out of ten on February 27, 2019[8]); R. 375 (pain at a zero out of ten on March 21, 2019).] These notes seemingly support the ALJ's assessment that Plaintiff's pain was controlled, and that impression is bolstered by the ALJ mentioning two of those instances twice. [R. 21, 22, 23.] But, while Plaintiff did report some alleviation of pain with treatment [*see* R. 375 (reporting improvement after he had had two appointments within the previous month), the record includes *at least* eight instances Plaintiff rated his pain at a four or above out of ten within the same date range, all of which the ALJ neglected to mention. [*See* R. 414 (pain five out of ten on November 16, 2016); R. 410 (pain seven out of ten on February 10, 2017); R. 407 (pain four out of ten on July 26, 2017); R. 403 (pain four out of ten on October 18, 2017); R. 397 (pain four to five out of ten on January 30, 2018; R. 392 (pain six out of ten, which Plaintiff described as "high moderate to severe" and "improved by nothing" on May 25, 2018); R. 387 (pain "steady" at six out of ten on September 17, 2018); R. 383 (pain level nine out of ten on February 19, 2019[9]); R. 370 (pain five out of ten on June 27, 2019).] The records also reflect Plaintiff consulting with other rheumatologists and specialists, and multiple new and changing prescriptions, which appear to have been responses to Plaintiff's complaints of pain or other symptoms. The changes to Plaintiff's treatments, including varying Kenalog injection doses, periodic Prednisone additions, pain medication alterations, and a new prescription for a Humira Pen on June 27, 2019, just before Plaintiff's DLI, also do not support the ALJ's assessment that

---

[8] The notes of this visit indicate that Plaintiff was "worked in" to the schedule "due to an increase in right knee pain" and received an injection. [R. 379, 383.]

[9] Plaintiff, in fact, had three rheumatology appointments between February 19, 2019, and March 21, 2019.

10

Plaintiff had demonstrated "generally good response to prescribed treatment." [R. 373, 376, 384, 385, 390, 395, 401, 405, 407, 411, 415-16, 419.] Because "pain alone can be disabling," *Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016), the ALJ must minimally explain his rejection of Plaintiff's descriptions of his pain, especially where those descriptions appear to find have some corroboration in the medical records.

The ALJ's conclusion that "treatment notes do not document flares," too, reflects cherry-picking and thus is not, without more to explain the ALJ's conclusion, borne out by the record. The ALJ characterized Plaintiff's reference to "flares" as "[gout] flares" and then discounted them given treatment notes that Plaintiff's gout was controlled. This leads the Court to believe that the ALJ used "flares" narrowly in the context of gout only. [*Compare* R. 23 (stating that Plaintiff testified about "[gout] flares") *with* R. 180 (describing "RA . . . flareups [that] last months at a time").] While Plaintiff's gout appears to have been generally controlled with medication, such that he had not recently experienced gout flares, the treatment notes nevertheless are replete with references to "flares" of Plaintiff's joint pain, which the Court understands to have been attributed to his rheumatoid arthritis or another condition. [R. 383 (Plaintiff was fit into the schedule that day after complaining of "generalized joint/muscle pain" that was "getting worse"); R. 401 (Plaintiff was "worked in" to the schedule after reporting "a multiple joint pain flare"); R. 407 (Plaintiff complained of "flares since last visit in bilateral knees, shoulders and hands which last for about two weeks" with a "[b]ilateral shoulder flare presently for the last couple of weeks"); R. 403 (Plaintiff reported "whole body" aches); R. 410 (Plaintiff described "all over bone and muscle aches").] Again, the ALJ did not reference those components of the record and, in fact, relied upon the supposed lack of flare events to reject Plaintiff's description of his symptoms.

Similarly, as Plaintiff points out, the reasons for the ALJ's rejection of Plaintiff's description of his symptoms as inconsistent with his daily activities are not explained. It is unclear,

11

for example, why the ALJ believed that Plaintiff's self-care, meal preparation (with breaks), occasional driving, using a riding lawnmower, and the like are inconsistent with his medical records (much less support a finding that Plaintiff could perform light work without a single accommodation). After all, treatment notes reflect Plaintiff's reports of impacts upon his daily life. [*See, e.g.*, R. 397, 392 (indicating that Plaintiff's "[p]ain is aggravated by activities of daily living"); R. 383 ("His wife reports he cries out at night when he rolls over in bed."); R. 380 (noting that Plaintiff experienced pain when standing from sitting or sitting down or traversing stairs).] Plaintiff, moreover, described impacts from his condition upon lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentration, and using his hands. The ALJ generally did not comment on the medical notations or Plaintiff's stated limitations in specific types of movement, and the Court cannot discern how the daily activities Plaintiff described are inconsistent with his descriptions of pain and fatigue or limitations on movement or are consistent with an ability to engage in full-time light work.[10]

The ALJ finally shoehorned Plaintiff's complaints of fatigue into a discussion of Plaintiff's apparently improved (with the help of a CPAP) sleep apnea and did not further address Plaintiff's insistence that his fatigue persisted. As with the ALJ's failure to mention Plaintiff's frequent reports of pain, changes of medication, references to "flares," and the impact of Plaintiff's condition on his life, the Court cannot trace the ALJ's reasoning as to entirely disregarding Plaintiff's descriptions of fatigue.

In short, given the ALJ's skirting of much of the evidence that would support a finding of disability in favor of only addressing evidence supporting a denial of benefits, the ALJ failed to construct the required "logical bridge" between the medical record and his conclusions, and his

---

[10] This discussion also renders suspect the ALJ's rejection of Dr. Dansdill's April 2021 assessment of Plaintiff's abilities as inconsistent with treatment notes.

12

opinion accordingly lacks the weight of substantial evidence. *See, e.g., Sharon B. v. Kijakazi*, No. 20 C 6910, 2023 WL 5096747, at *4-5 (N.D. Ill. Aug. 8, 2023) (remanding where "some of [plaintiff]'s subjective symptoms and limitations would be inconsistent with an ability to engage in substantial gainful employment," and the ALJ had not addressed plaintiff's claims of pain or specified "how [he] assessed [plaintiff]'s activities of daily living" as consistent with full-time work); *Krusec v. Colvin*, No. 15-CV-498-JDP, 2016 WL 3703088, at *2 (W.D. Wis. July 8, 2016) (holding that, where ALJ "did not address important parts of the record evidence that appear to contradict his conclusion" as to plaintiff's pain, ALJ had not "'buil[t]a logical bridge from evidence to conclusion'" in drafting RFC); *Anderson v. Astrue*, No. 09 C 2399, 2011 WL 2416265, at *19 (N.D. Ill. June 13, 2011) (holding that ALJ's "conclusions [we]re contrary to a number of treatment records that the ALJ failed to discuss" and thus could not "support the credibility determination in this case," so "RFC assessment was not supported by substantial evidence").

The ALJ must minimally explain which aspects of Plaintiff's testimony he credits or disregards and why, with reference to the record. The Court stresses that the foregoing should not be construed as an indication that the Court believes that Plaintiff is disabled or that he should be awarded benefits. The Court leaves those issues to be determined by the Commissioner after further proceedings. Given the Court's remand on the above grounds, the Court does not reach any other issues Plaintiff raises in this appeal. On remand, the ALJ is encouraged to consider those issues.

### III.  CONCLUSION

For the reasons detailed above, Plaintiff's motion for summary judgment [Dkt. 18] is granted, and the Commissioner's motion [Dkt. 19] is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

ENTERED: October 20 2023

                                                  Hon. Keri L. Holleb Hotaling,
United States Magistrate Judge